## DECLARATION IN SUPPORT OF VERIFIED COMPLAINT

Under 28 U.S.C. § 1746, I, Stuart Siegel, Special Agent of the United States Secret Service ("USSS"), make the following unsworn declaration, under the penalty of perjury, in support of the Verified Complaint to which this declaration is attached.

## INTRODUCTION

1. This declaration is made in support of a Verified Civil Complaint for property constituting fraud proceeds, as determined by a Medicare fraud scheme investigation. The Defendant Property is subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and (C), on the grounds that it represents property which constitutes or is derived, directly or indirectly, from proceeds traceable to 18 U.S.C. 1343 (wire fraud), 1347 (health care fraud), 1349 (conspiracy to commit wire fraud and health care fraud), and 1956 (money laundering and conspiracy to commit money laundering). This declaration is based upon my personal knowledge and experience obtained as case agent in the above case and information I have received from other law enforcement.

2. Because this declaration is being submitted for the limited purpose of establishing my reasonable belief that the United States can demonstrate, by a preponderance of the evidence, that the Defendant Property is the proceeds of the above-referenced criminal activity, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to meet the United States's burden of proof that the seized funds are subject to forfeiture through this civil case.

**Declaration in Support of Verified Complaint – Page 1**

**Exhibit A**

## AGENT BACKGROUND

3.　　I am a Special Agent with the USSS stationed in Dallas, Texas, and have been so employed since June 2023. I received criminal investigative training relevant to the subject areas addressed by the USSS at the Federal Law Enforcement Training Center in Glynco, Georgia, and at the James J. Rowley Secret Service Training Center in Beltsville, Maryland, pertaining to criminal investigations of, among other things, counterfeit currency, bank fraud, money laundering, wire fraud, access device fraud, and identity theft. I am an investigative and law enforcement officer of the United States, in that I am empowered by law to execute warrants issued under the laws of the United States and to make arrests for felony offenses, under authority of 18 U.S.C. § 3056.

## PROPERTY TO BE FORFEITED TO THE UNITED STATES OF AMERICA

4.　　The property sought for forfeiture through these forfeiture proceedings includes the following assets (hereafter, the "Defendant Property") seized from bank accounts held in the name of Syed Ali Hussain and in the names of entities he owns and/or controls:

| Asset ID | Asset Description |
| --- | --- |
| 23-USS-000576 | $20,891,779.86 seized from Bank of America account x2344, held in the name of Syed Ali Hussain, on July 24, 2023 |
| 23-USS-000575 | $3,115,459.30 seized from Bank of America account x3949, held in the name of Syed Ali Hussain, on August 4, 2023 |
| 23-USS-000579 | $200,000.00 seized from Comerica Bank account x7626, held in the name of Aan Rags Inc., on August 11, 2023 |
| 23-USS-000578 | $115,000.00 seized from First-Citizens Bank and Trust account x6674, held in the name of Infinite Rags Exports, on August 16, 2023 |

Declaration in Support of Verified Complaint – Page 2

Exhibit A

| | |
|---|---|
| 23-USS-000580 | $95,000.00 seized from East West Bank account x2827, held in the name of American Used Clothing Inc., on September 5, 2023 |
| 23-USS-000577 | $31,041.74 seized from Bank of America account x0451, held in the name of Fast Practice Innovations LLC, on October 3, 2023 |
| 24-USS-000500 | $46,255.44 seized from Bank of America account x0896, held in the name of Syed Ali Hussain, on October 3, 2023 |
| 24-USS-000501 | $44,775.00 seized from PNC Bank account x0844, held in the name of United Rags Recycler LLC, on December 15, 2023 |
| 24-USS-000502 | $1,420.30 seized from PNC Bank account x5923, held in the name of Zoya Wireless Inc., on December 15, 2023 |

The Defendant Property—totaling $24,540,731.64—was seized by the USSS pursuant to federal seizure warrants.

## BACKGROUND AND CONTEXT

### The Medicare Program

5.  Medicare is a federal health care program that provides medical benefits, items, and services to beneficiaries aged 65 or older, under age 65 with certain disabilities, and of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant). The Centers for Medicare and Medicaid Services ("CMS") is an agency of the Department of Health and Human Services and is the federal governmental body responsible for the administration of Medicare.

6.  Medicare includes coverage under component parts. Medicare Part A is a hospital insurance program that covers beneficiaries for, among other types of care, inpatient care in hospitals and other facilities. Medicare Part B is a medical insurance

Exhibit A

program that covers doctors' services, outpatient care, diagnostic testing, durable medical equipment, and other medical items and services not covered under Medicare Part A.

7. Laboratories, pharmacies, physicians, nurse practitioners, and other health care providers that furnish items and services to Medicare beneficiaries are referred to as Medicare "providers." To participate in Medicare, providers are required to submit a Medicare enrollment application, which requires providers to certify that they will abide by Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

8. Medicare claims are required to be properly documented in accordance with Medicare rules and regulations. To receive payment from Medicare, providers submit claims to CMS that are required to set forth, among other information, the Medicare beneficiary's name and unique Medicare beneficiary identification number, the item or service provided to the beneficiary, the date the item or service was provided, and the cost of the item or service.

9. Medicare will not reimburse providers for claims for items or services that were procured in violation of the Federal Anti-Kickback Statute or in violation of the provision prohibiting the purchase, sale, and distribution of Medicare beneficiary identification numbers.

10. Novitas Solutions, Inc. ("Novitas"), the Medicare Administrative Contractor Jurisdiction H for the state of Texas, evaluates and adjudicates, and processes

**Declaration in Support of Verified Complaint – Page 4**

Exhibit A

claims sent to Medicare. If claims are approved, funds are transferred directly to the provider's bank account listed in the EFT Authorization Agreement.

11. Novitas receives claim information for billing purposes at their office in Mechanicsburg, Pennsylvania and uses US Bank to make Jurisdiction H payments. US Bank's main office for Jurisdiction H payments is in St. Louis, Missouri.

**Steps in the Medicare Enrollment Process**

12. To become eligible to submit claims to Medicare, a company must first apply for a unique National Provider Identifier ("NPI") number from CMS. After obtaining an NPI, a company can apply to the Medicare Administrative Contractor, in this case, First Coast Service Options, for Medicare provider billing privileges. The company can do this by completing a Medicare Enrollment Application Form along with any necessary supporting documentation. After completing the application form, the company may obtain a provider ID number. A supplier must have both an NPI and a provider ID number to be eligible to receive Medicare payment for covered services.

13. The application form is a key step in the Medicare enrollment process for Medicare Part B providers, including clinical labs. The form calls for information about the owners (any person with at least a five-percent stake in the company" and managing employees (any individual who has operational or managerial control over the provider, or who conducts the day-to-day operations of the provider).

14. Finally, the application form requires that an authorized official certify the contents of the application and attest that the company meets and will maintain certain

**Declaration in Support of Verified Complaint – Page 5**

Exhibit A

requirements.  In relevant part, the certification states that the official: (a) "agree[s] to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization" (b) "understand[s] that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law"—which prohibits doctors from referring Medicare/Medicaid patients for certain services to entities where the doctor has a financial interest); and (c) "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

### Medicare Beneficiary Identification Numbers

15. Each Medicare beneficiary is identified with a unique beneficiary identification number.  These beneficiary identification numbers are used to determine a beneficiary's eligibility for Medicare benefits and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services.  HICNs and MBIs are two types of Medicare beneficiary identification numbers.

16. HICNs were typically comprised of the beneficiary's social security number and often include 1 or more additional letters.  In 2015, Congress passed the Medicare Access and CHIP Reauthorization Act ("MACRA"), which mandated that CMS phase out the use of social security numbers in the assignment of Medicare beneficiary identification numbers.

**Declaration in Support of Verified Complaint – Page 6**

**Exhibit A**

17. Following the passage of MACRA, CMS began to assign Medicare beneficiaries MBIs, which are comprised of a unique series of 11 randomly generated numbers and letters. MBIs, like HICNs, are used to identify qualifying beneficiaries in all Medicare transactions such as billing and claim submissions. One purpose of using a randomly generated series of numbers and letters was to improve patient identity protection and prevent identify theft.

**OTC COVID-19 Tests**

18. Beginning on April 4, 2022, and continuing through the end of the COVID-19 public health emergency, Medicare covered and paid for OTC ("over the counter," i.e., not prescribed or ordered by a physician) COVID-19 tests at no cost to beneficiaries with Medicare Part B and Medicare Advantage plans. Eligible providers capable of providing ambulatory health care services were permitted to distribute OTC COVID-19 tests that were approved, authorized, or cleared by the U.S. Food and Drug Administration.

19. Medicare would not pay for more than 8 OTC COVID-19 tests, per calendar month, per Medicare beneficiary. Providers could distribute OTC COVID-19 tests to Medicare beneficiaries who requested them and were required to keep documentation showing a Medicare beneficiary's request for the tests. The guidance promulgated by Medicare regarding the provision of and billing for COVID-19 tests states that the tests are to be provided to the beneficiaries only upon request, and that

failure to have documentation demonstrating that the beneficiary requested the tests is grounds for recoupment of funds.

20.     Medicare did not cover OTC COVID-19 tests billed by durable medical equipment suppliers or providers who distributed OTC COVID-19 tests to Medicare beneficiaries during an inpatient stay at a hospital or skilled nursing facility.

21.     When submitting claims to Medicare for COVID-19 tests, providers use HCPCS codes, five-character, alphanumeric identifiers that are intended to simplify reporting and accurately identify equipment and services that are supplied to a patient. These codes are published by the American Medical Association and are part of a uniform coding system used to identify, describe, and code medical, surgical, and diagnostic services performed by practicing physicians and other health care providers, as well as supplied equipment and materials.

22.     Medical providers indicate on their reimbursement claims the HCPCS codes that correspond to the types of equipment or services for which Medicare is being charged.  These codes are used to determine the reimbursement.  The HCPCS code relevant to this case is K0134, which is defined as follows: "Provision of COVID-19 test, nonprescription self-administered and self-collected use, FDA-approved, authorized or cleared, one test count."[1]

---

[1] *See* https://www.aapc.com/codes/hcpcs-codes/K1034

**Declaration in Support of Verified Complaint – Page 8**

Exhibit A

23. The Medicare claims form (Form CMS-1500) requires providers to certify that the claim complied with applicable Medicare laws and regulations, including the Anti-Kickback Statute. When a CMS Form 1500 is submitted, the provider certifies that the contents of the form are true, correct, and complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare program. On the form, the Medicare provider certifies that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations." The form advises the provider that "anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws."

## FACTS AND CIRCUMSTANCES

24. The Defendant Property represents proceeds of a Medicare fraud scheme being investigated by USSS and Health and Human Services Office of Inspector General. The investigation has shown that an entity operating as Lone Star Medlab Laboratory ("Lone Star Medlab") and individuals acting on its behalf, both known and unknown, submitted false and fraudulent claims for several thousand COVID-19 test kits for Medicare beneficiaries. The investigation further revealed that Lone Star Medlab, and individuals acting on its behalf, transferred funds between accounts in order to promote

specified unlawful activities (wire fraud and health care fraud), evade taxes, and/or conceal or disguise the nature, location, source, ownership, or control of the proceeds.

25.  The claims appear fraudulent because, among other things: (1) deceased beneficiaries' information was used to bill Medicare; (2) no consent was obtained by Lone Star Medlab from beneficiaries for the receipt of the tests; (3) the tests sent and billed to Medicare were provided through the apparent unlawful purchase or transfer of Medicare beneficiary PII.  Between January and February 2023 alone, Lone Star Medlab submitted more than 287,000 claims to Medicare, billed more than $34 million, and was paid more than $26 million.

26.  Law enforcement officers obtained seizure warrants for approximately $24 million in fraud proceeds represented by the Defendant Property.  The investigation and financial tracing shows that proceeds of the scheme were transferred from Bank of America account x2344 to the other accounts from which the Defendant Properties originated.

27.  Although this case was investigated as a criminal matter, the primary known suspect, Syed Ali Hussain, has fled the jurisdiction of the United States.  To date, no arrests have been made.

28.  The USSS has not received any inquiries from attorneys or potential claimants concerning the seizure of the Defendant Properties.  The only known potentially interested parties are Syed Ali Hussain and the companies in whose names some of the Defendant Properties were held.  Although Syed Ali Hussain's current

**Declaration in Support of Verified Complaint – Page 10**

**Exhibit A**

whereabouts are unknown and the operating status of the companies is unclear; nonetheless, the United States will attempt to make direct service on all potentially interested parties at their last known addresses.

## CONCLUSION

29. Based upon the facts set forth herein, I believe that the Defendant Property is subject to forfeiture as proceeds traceable to violations of 18 U.S.C. §§ 1343 (wire fraud), 1347 (health care fraud), 1349 (wire fraud conspiracy and health care fraud conspiracy), and 1956 (money laundering and conspiracy to commit money laundering), or was used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of violations of 18 U.S.C. §§ 1956.

30. Under 18 U.S.C. § 984, for any forfeiture action *in rem* in which the subject property consists of cash, monetary instruments in bearer form, or funds deposited in an account in a financial institution:

    a. The government need not identify the specific funds involved in the offense that serves as the basis for the forfeiture;
    b. It is not a defense that those funds have been removed and replaced by other funds; and
    c. Identical funds found in the same account as those involved in the offense serving as the basis for the forfeiture are subject to forfeiture.

31. In essence, 18 U.S.C. § 984 allows the government to seize for forfeiture identical property found in the same place where the "guilty" property had been kept. The statute does not, however, allow the government to reach back in time for an unlimited period. Under § 984, therefore, for all proceeds of specified unlawful

**Declaration in Support of Verified Complaint – Page 11**

**Exhibit A**

activities occurring in the past 12 months, the Government need not directly identify the property and can instead seek forfeiture of the bank accounts as fungible assets. The Defendant Property was seized less than 12 months from the date that the fraudulent proceeds were transferred to the above-referenced accounts.

32. I declare, pursuant to 28 U.S.C. § 1746, that the foregoing is true and accurate to the best of my knowledge and belief.

Respectfully submitted,

Stuart Siegel
Special Agent
United States Secret Service

**Exhibit A**